## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

TAMARA L. WRIGHT,

     Plaintiff,

     v.

WILLOW LAKE APARTMENTS (MD)
OWNER, LLC and
MORGAN PROPERTIES MANAGEMENT
COMPANY, LLC,

     Defendants.

Civil Action No. TDC-22-0484

## MEMORANDUM OPINION

Plaintiff Tamara L. Wright, a former tenant of Willow Lake Apartments ("Willow Lake") in Laurel, Maryland, has filed suit against Defendants Willow Lake Apartments (MD) Owner, LLC and Morgan Properties Management Company, LLC, the owners of Willow Lake, alleging that Defendants failed to protect her and her dog from the threatening conduct of other tenants and gun violence on the premises, falsely billed her for damage to her apartment, unjustifiably retained her security deposit, and wrongfully reported her to a collections agency and credit reporting agencies for failing to pay the allegedly unfounded charges. Wright alleges unfair, abusive, or deceptive trade practices, in violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law. §§ 13–101 to 13–320 (West 2017); retaliation in violation of the County Code of Prince George's County, Maryland (the "Prince George's County Code"), Prince George's Cnty., Md., Code of Ordinances § 13–160 (2022); improper retention of her security deposit, in violation of the Prince George's County Code, *id.* § 13–159(h); and common law claims of fraud, negligence, breach of the covenant of quiet enjoyment, constructive eviction, and tortious

interference with a prospective advantage. Defendants have filed a Motion to Dismiss, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Wright resided in a rented apartment at Willow Lake from April 12, 2016 to June 6, 2021. In November 2019, Wright purchased a dog, a Siberian Husky mix puppy, which grew to weigh approximately 100 pounds and lived with her in her apartment for the remainder of her tenancy. Wright had another dog, a Chihuahua, which also lived in her apartment.

Between August 2019 and February 2020, Wright's son, Gabriel Dixon, lived with her in the apartment. Although Dixon was listed on the lease during this time period, when Wright renewed her lease for the period from August 10, 2020 to June 9, 2021, Dixon was removed from the lease and thus had no obligations relating to it.

## I.    Dog Harassment

Wright first alleges that she and one of her dogs were subjected to harassment by multiple tenants within the Willow Lake apartment complex (collectively, "the Tenants"). Beginning in April 2020, Wright occasionally encountered another tenant ("Tenant 1") and his dog while walking her dog. During these encounters, Tenant 1's dog became aggressive toward Wright's dog, attacked Wright's dog, and baited Wright's dog to fight. Wright refused to allow her dog to fight with Tenant 1's dog and asked Tenant 1 to control his dog. According to Wright, despite her requests, Tenant 1 refused to control his dog. As a result, Wright decided to avoid Tenant 1 and his dog. Nevertheless, on April 3, 2021, Wright and her dog were "assaulted" while on her patio by Tenant 1 and his dog, who came out from behind a building outside of Wright's view. Am.

2

Compl. ¶ 43, ECF No. 37. Wright alleges that Tenant 1's dog "aggressed on" Wright's dog while Tenant 1 watched and refrained from intervening to end the attack "until the very end." *Id.* ¶ 44. During the attack, Wright was forced to use her hand to block the patio door latch "while trying to shove and kick" Tenant 1's dog away and trying to get her dog "safely inside." *Id.*

Meanwhile, beginning in August 2020, a second Willow Lake tenant ("Tenant 2") frequently used sticks and his dog to "taunt," "provoke," and goad Wright's dog. *Id.* ¶¶ 31–32, 36. Wright alleges that Tenant 2 often stared into her apartment at her dog for long periods of time. Although Wright requested that Tenant 2 cease this conduct, he ignored her requests and sometimes yelled at her in response. Beginning in February 2021, a third Willow Lake tenant ("Tenant 3") also "taunted" her dog with a bamboo stick and a whip. *Id.* ¶¶ 38, 40.

As a result, beginning after the April 3, 2021 incident with Tenant 1 and his dog, Wright was "unable to walk her dog around the perimeter" of the apartment complex because "she feared confrontations" with the Tenants and their dogs. *Id.* ¶ 46. Wright specifically feared that they were "hiding behind parked cars" in the parking lot. *Id.* Therefore, instead of walking her dog, Wright felt compelled to have her dog relieve himself while standing on a 12-foot line at the center of her patio so that she could "stand guard" and get her dog to safety if the Tenants and their dogs appeared. *Id.*

On April 8, 2021, because of the ongoing harassment, Wright informed Defendants that she did not intend to renew her lease at Willow Lake and would vacate her apartment when her lease ended on June 9, 2021. Two days later, on April 10, 2021, the building superintendent ("the Superintendent" or "Tenant 4"), an employee of Defendants who resided next door to Wright, approached Wright and asked her whether she was "moving because of the guys looking in her apartment and antagonizing her dog." *Id.* ¶ 51. The Superintendent informed Wright that

3

"dogfighting was active and popular in the community" and that the Tenants were taking these actions because they wanted her dog to fight. *Id.* Wright expressed her concerns about the harassment to the Superintendent with the belief that he would communicate them to Defendants. Wright later learned that the Superintendent was personal friends with Tenants 1, 2, and 3. Upon learning of these relationships, Wright felt "surrounded" and "outnumbered" and believed that she needed to protect herself and her dog by leaving Willow Lake. *Id.* ¶ 55.

On April 11, 2021, Tenant 2 "began to escalate in the frequency and severity of taunting and goading" Wright's dog. *Id.* ¶ 56. As a result, Wright's son, Dixon, took Wright's dog to his home for one week. On April 14, 2021, Tenant 3 approached her patio with a whip made of a bamboo stick with a rope on one end, but he retreated when Wright used her cell phone to attempt to video record him from inside her apartment. On April 15, 2021, another tenant ("Tenant 5") approached Wright's back door, placed his face to the glass, and stared into Wright's apartment while sending text messages and lightly knocking on the window. After Wright's dog returned to the apartment on April 18, 2021, the harassment resumed with increasing frequency. On May 9, 2021, Wright observed Tenant 3 and another man "standing and staring squarely back at her from the edge of her patio in the dark." *Id.* ¶ 68.

On June 5, 2021, as Wright loaded her belongings into her vehicle, another tenant ("Tenant 6") sat on his patio observing her. When Wright looked at Tenant 6, he smiled and lifted up the front paws of his dog, in a gesture Wright asserts was "taunting." *Id.* ¶ 70. Tenant 6 continued staring at Wright for a long period of time. The same day, Wright reported these events to Defendants and requested their assistance. Defendants declined to assist her.

## II.     Gun Violence

Wright also alleges that Defendants failed to protect her from gun violence on the premises. During Wright's tenancy, several shootings took place at Willow Lake.  In March 2020, an assailant fired multiple shots into an occupied apartment.  On April 13, 2020, Wright witnessed an individual on the other side of the lake shoot and injure a man on his patio.  When the shooter fled toward the Willow Lake office, Wright called that office to warn the staff about the shooting and also reported it to the police.  Between April 2020 and June 2021, Wright personally heard "multiple" additional shootings "in and near" the apartment complex.  *Id.* ¶ 15.  These shootings increased in frequency between 2020 and 2021.  Although Defendants released crime alerts related to other incidents at Willow Lake, such as car break-ins, Defendants did not issue crime alerts to warn tenants about the various shootings.

Then on June 6, 2021, around 3:00 a.m., while cleaning her apartment and loading her belongings and her dog into her car, Wright heard a single gunshot "fired at close range" approximately 50 feet away from her.  *Id.* ¶ 75.  Wright was unable to see who fired the gunshot or from where exactly the gunshot originated.  Wright asserts that, based on her military and law enforcement experience, she was able to determine that the weapon was likely a .357 or 9-mm handgun, the gun was fired outside, and the gunshot originated from one of the two shaded locations 50 feet to the right of Wright and her car.  Based on her observations, Wright believed that the gunshot was likely an escalation of the ongoing dog harassment and that she was in danger. She therefore fled the apartment complex by car and drove to a nearby gas station.

## III.     Early Lease Termination

Because Wright felt that she could not safely return to Willow Lake, she continued driving and never returned to her apartment to collect her remaining belongings.  The same day, June 6,

2021, Wright called Defendants to report the gunshot and her resulting departure. Wright also provided her forwarding address and assured them that she would pay her final costs.

On June 7, 2021, Wright requested that Defendants provide her with her final balance when it became available. Defendants told her that they would do so, but Wright never received that information. On June 9, 2021, three days after her departure, Wright's lease expired. On June 15, 2021 or June 16, 2021, Defendants completed Wright's final invoice.

On June 30, 2021, Wright again requested that Defendants provide her with a final balance and also explained to Defendants why she departed the apartment three days early and left the apartment without having fully moved out. Defendants informed her that they did not have her final balance and would provide it to her at a later time. During this time period, Wright also tried to obtain her final balance by accessing Willow Lake's online resident portal, but Defendants had blocked Wright's access to the website. Because Defendants never provided her with a copy of her final bill, Wright did not have the information needed to provide her final payment to Defendants.

## IV.   Referral to a Collection Agency

On August 2, 2021, without ever providing Wright with her outstanding balance, Defendants reported Wright and her son, Dixon, to a collection agency, the National Credit Audit Corporation ("NCAC"). On August 7, 2021, Wright received a letter notifying her of the referral to NCAC and stating that she and Dixon owed Defendants $1,099.19. On August 9, 2021, NCAC provided Wright with an invoice reflecting her final balance. The invoice reflected that Wright received a credit for two days of rent based on a constructive eviction.

V.    **Damage and Repair Fees**

The invoice providing Wright's final balance included charges for unpaid rent, utility charges, and fees. The invoice also included $808.48 in damage and repair charges, including a $20 charge for damage to the cabinets; a $228.48 charge for carpet replacement; a $200 charge for underflooring repair; and a $360 charge for patching, painting, priming, and drywall repair. Wright asserts that the $20 fee for damage to the cabinets is unfounded because the damage consisted of "normal wear and tear" and was due to the "inferior" quality of the material used to construct the cabinets. *Id.* ¶ 108. Wright further contends that the carpet replacement charge was unjustified because the carpet was of "grossly inferior quality" when she moved into the apartment and had "extensively deteriorated" through "normal wear and tear." *Id.* ¶ 114. As for the underflooring repair charge, Wright asserts that it is unjustified because, as depicted in a photograph, the damage was to "padding" not "underflooring," that such padding is covered by Willow Lake's "standard replacement policy," and that there were no floorboards that required sealing. *Id.* ¶¶ 115–16. Finally, Wright alleges that there was no drywall damage necessitating patching, painting, priming, or drywall repair.

On August 19, 2021, Wright called Willow Lake to speak to the acting manager regarding her disagreement with these charges on the final bill. Wright was told that although the acting manager was present and available, she would not speak with Wright. On August 23, 2021, Wright sent an email to Defendants regarding her various reports to the office but did not receive a response.

VI.    **Referral to Credit Reporting Agencies**

On September 15, 2021, NCAC sent an email to Wright demanding payment of the entire outstanding balance. In this email, NCAC warned Wright that it would report her to the major

credit reporting agencies if she refused payment. NCAC sent a similar email to Dixon. Because Dixon was not a party to the operative lease agreement, Wright threatened to take legal action against NCAC if it pursued Dixon, and NCAC agreed to cease its efforts to collect from Dixon. However, on September 28, 2021, NCAC filed a "derogatory report" with the three major credit agencies, Experian, Equifax, and Transunion. *Id.* ¶ 132.

According to Wright, because of this report and the resulting negative impact on her credit report, she lost multiple employment opportunities. For example, Wright alleges that on September 29, 2021, she received a conditional offer of employment on a federal contract, but her employment "never transpired." *Id.* ¶ 133. Similarly, on February 1, 2022, Wright was contacted by a federal contracting agency about her interest in a position as a paralegal, but after the agency received her credit report, Wright was not offered the position. Wright has since been denied employment.

## VII.   Procedural History

On December 27, 2021, Wright filed the original Complaint in this case in the Circuit Court of Prince George's County, Maryland. On February 28, 2022, Defendants removed the action to this Court. In the now operative Amended Complaint, Wright alleges the following causes of action: (1) fraud; (2) improper retention of her security deposit, in violation of section 13–159(h) of the Prince George's County Code; (3) violations of the MCPA; (4) retaliation in violation of section 13–160 of the Prince George's County Code; (5) negligence; (6) breach of the covenant of quiet enjoyment; (7) constructive eviction; and (8) tortious interference with a prospective advantage.

8

## DISCUSSION

In their Motion, Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6) on the grounds that Wright has failed to state a plausible claim for relief on any of the causes of action in the Amended Complaint.

## I.   Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). Although district courts have a duty to construe liberally pleadings filed by a party without an attorney, a self-represented plaintiff must nevertheless allege facts that state a cause of action and provide enough detail to illuminate the nature of the claim and allow defendants to respond. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (stating that the duty to construe *pro se* pleadings liberally does not require courts to "conjure up questions never squarely presented").

## II.   Fraud

In the Amended Complaint, Wright alleges six counts of fraud including (1) four counts relating to allegedly fraudulent charges based on damage to her apartment; (2) one count of fraudulent reporting of false charges against her to the collection and credit reporting agencies;

and (3) one count of fraudulent retention of her security deposit and interest. Defendants assert

that as to all of these claims, Wright has failed to plead sufficient facts to support a plausible claim

for fraud. Under Maryland law, to plead a claim for fraud, a plaintiff must allege that (1) a false

representation was made by a party; (2) its falsity was known to that party or the misrepresentation

was made with such reckless indifference to the truth as to impute knowledge to the party; (3) the

misrepresentation was made for the purpose of defrauding the victim; (4) the victim relied on the

misrepresentation and had the right to rely on it; and (5) the victim suffered damage directly

resulting from the misrepresentation. *Gross v. Sussex, Inc.*, 630 A.2d 1156, 1161 (Md. 1993).

### A.     Damage and Repair Fees

Wright first alleges fraud based on the imposition of charges against her for damage to her

apartment, specifically: (1) $228.48 for carpet replacement; (2) $200 for underflooring repair; (3)

$20 for cabinet damage; and (4) $360 for patching, priming, and drywall repair, for a total amount

of $808.48. Wright has alleged facts supporting her claim that she is not responsible for these

conditions, including that the carpet was of "grossly inferior quality," Am. Compl. ¶ 159, that the

underflooring was not actually damaged and that in any event any damage was not caused by her

dogs, that the condition of the cabinets was the result of "normal wear and tear" and their inferior

quality, *id.* ¶ 181, and that there was no need for painting, patching, priming, or drywall repair.

However, even if such allegations could be deemed sufficient to support a claim that the charges

were unjustified and therefore constituted false representations, and that Defendants made them

with reckless indifference to their truth in order to defraud Wright, the claims for fraud fail because

Wright has not alleged and cannot plausibly allege that she relied on these misrepresentations to

her detriment. Rather, Wright has steadfastly maintained that the charges were not justified and

has refused to pay them. Because Wright was not misled by the charges and did not rely on them,

she has not sufficiently pleaded claims for fraud based on the charges for damage to the apartment. *See Sav. Bank Ret. Sys. v. Clarke*, 265 A.2d 921, 924–25 (Md. 1970) (finding that the plaintiffs did not sufficiently state a claim for fraud where they did not rely on the alleged misrepresentations).

### B.      Referral to Third Parties

Wright also asserts that Defendants engaged in fraud by making false representations in reporting her account to a collection agency, NCAC, as well as to several credit reporting agencies. Although Wright has arguably alleged sufficient facts to show that such a report contained false statements because the charges against her were unjustified, this claim also fails on the reliance element.   Under certain circumstances, a plaintiff may recover for fraud even when the allegedly fraudulent statement was not made to the plaintiff directly, but to a third party. *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 49 (Md. 2013).  However, to successfully bring a claim of fraud based on a theory of third-party reliance, the plaintiff must also demonstrate personal reliance on the representation. *Id.* at 50–51.  Without such reliance by the plaintiff, an allegation that a third party relied on the representation to the detriment of the plaintiff is insufficient to support a claim of fraud. *Id.*  Here, even if the collection agency and credit reporting agencies relied on the false information, because Wright did not personally rely on false representations about her unpaid balance or the status of her account, her claim of fraud based on third-party reliance fails. *See id.* at 51.

### C.      Retention of Security Deposit

Wright also alleges fraud based on Defendants' retention of her security deposit.  Because this claim does not involve any representations made by Defendants, common law fraud is not the

appropriate cause of action. *See Gross*, 630 A.2d at 1161 (holding that a claim for fraud must be based on a false representation by the defendant). The fraud claims will therefore be dismissed.

**III.    Section 13–159(h) of the Prince George's County Code**

In asserting her claim of fraud relating to the retention of her security deposit, Wright also alleges that the retention of her security deposit violated section 13–159(h) of the Prince George's County Code.  Construed liberally, the Amended Complaint alleges a violation of this provision separate from any fraud claim.  Under that provision, a landlord may withhold a security deposit, or any portion thereof, for "unpaid rent, damage due to breach of [the] lease, or for damage to the leased dwelling unit by the tenant, his family, agents, employees, or social guests in excess of ordinary wear and tear." Prince George's Cnty., Md., Code of Ordinances § 13–159(h)(2)(A).  In order to withhold a security deposit in this manner, "a detailed statement of any damages or violations of the lease together with the cost actually incurred shall be mailed by first class mail directed to the last known address of the tenant" within 30 days of the termination of the lease. *Id.* The failure of the landlord to mail such a notice "shall cause the landlord to forfeit any right to withhold any part of the security deposit for damages." *Id.* § 13–159(h)(2)(B).  Wright asserts, and Defendants do not dispute, that they did not mail any such notice to Wright.

Defendants, however, assert that because the required notice is to provide a statement of "any damages or violations of the lease," the forfeiture clause in section 13–159(h)(2)(B) applies only to the part of the security deposit withheld for physical damage to the apartment.  Mot. Dismiss at 16, ECF No. 27-1.  They claim that because Wright's final balance included unpaid rent, fees, and utilities which exceeded the $500 value of her security deposit, the lack of a written notice does not preclude them from retaining the full security deposit to cover these costs.  This excessively narrow reading of the ordinance is unpersuasive.  Section 13-159(h)(2)(B) refers to a

forfeiture of the right to "withhold any part of the security deposit for damages," without specifying what type of damages. Prince George's Cnty., Md., Code of Ordinances § 13–159(h)(2)(B). In section 13–159(h)(2), the use of the term "damages" is not limited to references to charges for physical damage to a rental unit; rather, this section refers to "damages for lost future rents" and "damage due to breach of lease," as well as "damage to the leased dwelling unit . . . in excess of normal wear and tear." *Id.* § 13–159(h)(2)(A). Based on the plain language of this section, the Court finds that the forfeiture clause is intended to bar retention of the security deposit absent a notice relating to any form of damages, including damages for breach of the lease, such as unpaid rent or utilities. Because Defendants did not mail to Wright a written notice of the alleged damages, Defendants have "forfeit[ed] any right to withhold any part of the security deposit for damages." *Id.* § 13–159(h)(2)(B). Wright has thus sufficiently pleaded a violation of section 13–159(h) of the Prince George's County Code as to the retention of her security deposit.

## IV.   MCPA

Defendants also argue that Wright has failed sufficiently to plead a violation of the MCPA. Wright alleges that the same conduct underlying her fraud claims, including the charging of unfounded damage and repair fees to her final balance; wrongfully reporting her account to a collection agency and credit reporting agencies; and unjustifiably retaining her security deposit, violated the MCPA. As relevant here, the MCPA prohibits the use of an "unfair, abusive, or deceptive trade practice" in the "sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services" or in "the collection of consumer debts." Md. Code Ann., Com. Law § 13–303. An "unfair, abusive, or deceptive trade practice" can include a "[f]alse, falsely disparaging, or misleading oral or written statement . . . or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." *Id.* § 13–

13

301(1). As relevant here, to succeed on a private action for a violation of the MCPA, a plaintiff must demonstrate that (1) the defendant engaged in an unfair or deceptive practice or misrepresentation in the sale or offer for sale of consumer goods, realty, or services or in the collection of consumer debts, *id.*; (2) the plaintiff relied upon the representation, *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007); and (3) doing so caused actual injury, *Citaramanis v. Hallowell*, 613 A.2d 964, 968 (Md. 1992).

### A.     Damage Charges and Security Deposit

Wright alleges that Defendants violated the MCPA by charging her unfounded damage and repair fees. Under the MCPA, "[u]nfair, abusive, or deceptive trade practices" also include a "[k]nowingly false statement that a service, replacement, or repair is needed." Md. Code Ann., Com. Law § 13–301(7). Although Wright arguably may have properly pleaded such a statement arising from the damage and repair charges, the MCPA claim based on these charges fails for the same reason that the related common law fraud claim fails—because Wright has not alleged and cannot plausibly allege that she relied on the deceptive statements where she has steadfastly maintained that the charges were unjustified and refused to pay them. *See Lloyd*, 916 A.2d at 277 (holding that to succeed on a private claim under the MCPA, the plaintiff must have suffered injury "as a result of" the plaintiff's "reliance on" the defendant's misrepresentation); *Bank of America, N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 532, 534 (D. Md. 2011) (stating that "[c]onsumers must prove that they relied on the misrepresentation in question to prevail on a damages action under the MCPA" and finding that a plaintiff's MCPA claim failed because of the lack of evidence of such reliance); *see also Stewart v. Bierman*, 859 F. Supp. 2d 754, 769 (D. Md. 2012) (dismissing an MCPA claim in part because the plaintiffs failed to demonstrate that they relied upon the defendants' actions).

14

Likewise, to the extent that Wright asserts an MCPA claim based on Defendants' retention of her security deposit, where Wright has never conceded that the basis for the withholding of that deposit was justified, she has not alleged and cannot allege that she relied on any fraud or misrepresentation associated with that act. The Court will therefore grant the Motion as to these MCPA claims.

### B.      Referral to Third Parties

As for the MCPA claim based on the referral of her account to a collection agency and credit reporting agencies, Wright alleges that the unfair trade practice at issue consists of "[d]eception, fraud, false pretense, false premise, or misrepresentation . . . with the intent that a consumer rely on the same in connection with . . . [t]he subsequent performance of a merchant with respect to an agreement of sale, lease, or rental." *Id.* § 13–301(9)(iii). This provision, as well as the more general section 13–301(1), requires that the misrepresentation at issue be directed at a misleading a "consumer." *Id.* §§ 13–301(1), (9)(iii). Under the MCPA, a consumer is an "actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." Md. Code Ann., Com. Law. § 13–101(c)(1). The collection and credit reporting agencies do not constitute consumers. *See id.* Thus, because the alleged misrepresentations were not made to consumers or with the intent to induce consumer reliance, they are not actionable under the MCPA. The Court will grant the Motion as to this MCPA claim as well.

## V.      Retaliation

Defendants also assert that Wright has not sufficiently pleaded a claim for retaliation under the Prince George's County Code. Under the relevant provision, a residential landlord may not "harass, intimidate, threaten, or otherwise interfere with a tenant's exercise of their legal rights,"

15

"bring or threaten to bring an action for possession against a tenant," "increase the rent or decrease the services to which a tenant has been entitled," or "terminate a periodic tenancy" because the tenant has "complained, in good faith, to the landlord or to any public agency concerning the tenant's rights, specific housing deficiencies, an alleged violation of the lease, a violation of law, or a condition on the leased premises that is a substantial threat to the health or safety of occupants." Prince George's Cnty., Md., Code of Ordinances § 13–160(a). A tenant may raise "an affirmative claim for damages resulting from a retaliatory action of a landlord occurring during a tenancy." *Id.* § 13–160(b)(1), (b)(2).

Here, Wright claims that the following conduct occurred in response to her complaints about the dog harassment and gun violence and thus constituted retaliatory action under the Prince George's County Code: (1) declining to intervene in the harassment of Wright and her dog; (2) blocking Wright's access to the online resident portal and otherwise refusing to provide her an invoice or details about her unpaid balance; and (3) reporting Wright and her son to the collection agency. Most of these actions occurred after Wright's lease expired on June 9, 2021. Wright asserts that Defendants completed her final invoice on June 15, 2021 or June 16, 2021. Defendants blocked Wright's access to the online resident portal after the end of her lease, and they first refused to provide Wright with a final invoice on June 30, 2021. Defendants referred Wright and her son to the collection agency on August 2, 2021. Because all of this conduct occurred after the termination of her lease on June 9, 2021 and thus did not occur "during" the tenancy, the conduct does not fall within the purview of section 13–160(b).

As for Defendants' failure to intervene in the harassment of Wright and her dog, which did occur during the term of the lease, this conduct does not fall within the definition of a retaliatory action under section 13–160(a), which prohibits a landlord's harassment, intimidation, threats,

16

interference with the exercise of legal rights, rent increases, or termination of a periodic tenancy. To the extent that she may also be arguing that the gunshot fired on June 6, 2021 was a retaliatory action, she has not alleged sufficient facts to support the conclusion that the landlord engaged in that conduct. Thus, Wright has not sufficiently pleaded a claim for retaliation under section 13–160.

## VI.   Negligence

Defendants also argue that Wright has failed to plead sufficient facts to state a plausible claim of negligence. In the Amended Complaint, Wright asserts that Defendants were negligent in failing to intervene to address both the ongoing harassment of Wright and her dog by the Tenants and the ongoing gun violence at or near Willow Lake. To establish a claim of negligence, a plaintiff must meet four elements:  (1) that the defendant was under a duty to protect the plaintiff from injury; (2) that the defendant breached that duty; (3) that the plaintiff suffered actual injury or loss; and (4) that the loss or injury proximately resulted from the defendant's breach of the duty. *Wash. Metro. Area Transit Auth. v. Seymour*, 874 A.2d 973, 976 (Md. 2005).

### A.   Duty

Wright has sufficiently alleged that Defendants had a duty to protect Wright from the dog harassment and the ongoing gun violence. As to the dog harassment, which included the use of the Tenants' dogs to intimidate Wright and her dog, a landlord is liable for injuries caused by another tenant's dog where the landlord has knowledge of the potential danger and the ability to mitigate the danger. *See Shields v. Wagman*, 714 A.2d 881, 892–93 (Md. 1998). Here, Wright has asserted that she informed Defendants of the dog harassment. First, on April 8, 2021, she told them that because of the ongoing harassment, she did not intend to renew her lease. Second, on April 10, 2021, Wright reported the harassment to the Superintendent, an agent of Defendants.

17

Finally, on June 5, 2021, Wright reported an incident where Tenant 2 was staring at her through her windows. Particularly where at least some of the dog harassment occurred in the apartment complex's parking lot, a common area under Defendants' control, and where Wright notified Defendants of the harassment by the Tenants and their dogs, she has properly alleged that Defendants knew of, and thus had a duty to address, such harassment. *See id.* at 892–93 (finding that a landlord had a duty to protect tenants from dogs on the premises because the landlord knew of the potential danger and had the ability to rid the premises of that danger by refusing to renew the dog owner's lease).

As for the gun violence, a landlord has no special duty to protect tenants against crimes perpetrated by third parties on the landlord's premises. *Scott v. Watson*, 359 A.2d 548, 552 (Md. 1976). However, if the landlord knows, or should know, of criminal activity against persons or property in the common areas of the landlord's premises, the landlord then has a duty to take reasonable measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity. *Id.* at 554. This duty does not arise merely from "knowledge of general criminal activities in the neighborhood." *Id.* Moreover, the reasonable measures that a landlord must take are those that would prevent a harm that is foreseeable, based on the nature of the known criminal activity on the premises. *Hemmings v. Pelham Wood Ltd. Liab. P'ship*, 826 A.2d 443, 454 (Md. 2003). Wright has alleged that in March 2020, a gunman "emptied the chamber of his gun" into an occupied apartment at Willow Lake. Am. Compl. ¶ 13. On April 13, 2020, Wright directly reported to Defendants that there had been a shooting on the Willow Lake premises, after which the perpetrator fled in the direction of the Willow Lake office. She has further alleged that, from April 2020 to June 2021, there were multiple additional shootings "in or near" Willow Lake "which greatly increased in frequency." *Id.* ¶¶ 13, 15. The allegations are thus

18

sufficient to support an inference that Defendants knew or should have known about the gun violence on the premises and thus had a duty to take reasonable measures to eliminate the conditions contributing to the gun violence at Willow Lake. *See Scott*, 359 A.2d at 554.

### B.    Breach of Duty

Wright has also sufficiently alleged that Defendants breached their duty of care as to both the dog harassment and the gun violence. As to the dog harassment, a landlord breaches its duty to a tenant when the landlord knows that another tenant's dog presents a dangerous condition but fails to intervene. *See Shields*, 714 A.2d at 892–93; *Matthews v. Amberwood Assoc. Ltd. P'ship, Inc.*, 719 A.2d 119, 125–26 (Md. 1998). Wright has alleged that despite her reports of the dog harassment, Defendants continuously refused to intervene to address it. By alleging that Defendants knew about the harassment and failed to act to prevent it, Wright has alleged a breach of the duty. *See Shields*, 714 A.2d at 892–93 (finding that a landlord was responsible for injuries sustained in a common area caused by a pit bull because the landlord had knowledge of the potential danger of the pit bull and failed to remedy the danger); *Matthews*, 719 A.2d at 125–26 (finding that a landlord breached its duty to tenants whose child was killed by another tenant's pit bull because the landlord knew about the dangerous animal but failed to enforce a lease provision that could have required the dog's removal).

As for the ongoing gun violence, a landlord breaches its duty to its tenant when it is aware of ongoing criminal activity but takes no action either to remedy the situation, such as by taking "reasonable measures" to "eliminate the conditions contributing to the criminal activity," or by warning the tenants of the danger. *Scott*, 359 A.2d at 554. Wright has alleged that she notified Defendants of at least one shooting she observed, and that there were other shootings at Willow Lake of which it could be reasonably inferred that Defendants were aware. Wright has further

alleged that Defendants did not take reasonable measures to address the gun violence and, most particularly, did not issue crime alerts to warn her and other tenants of the gun violence. *Scott*, 359 A.2d at 553 (referencing a landlord's duty to warn tenants of known dangers including criminal activity). She has therefore alleged a breach of Defendants' duty to Wright to warn of and address criminal activity on the premises.

## C.   Causation

On the causation element, to be a proximate cause for an injury, the defendant's negligence must be a cause-in-fact and a legally cognizable cause. *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009). To be the cause-in-fact of injury, the defendant's negligence must have actually produced the injury in that it was either the "but for" cause of the injury or it was a "substantial factor in bringing about the harm." *Id.* at 786–87. To be a legally cognizable cause of injury, the plaintiff's harm must fall within a "general field of danger" that the defendant should have anticipated or expected. *Id.* at 787. In the context of negligence associated with failing to address criminal activity, causation may be established if the landlord's failure to take reasonable safety measures "enhanced the likelihood of the particular criminal activity which occurred." *Scott*, 359 A.2d at 556.

The Court finds that Wright has sufficiently pleaded causation as to her negligence claim based on the dog harassment. Where Wright reported the dog harassment to Defendants and the Superintendent in April 2021, and the Superintendent was aware of the identity of the Tenants at issue, it would be reasonable to infer that Defendants, in their capacity as the landlord of the apartment complex, had sufficient control over the way in which Tenants used their dogs in the alleged harassment of Wright and her dog such that their failure to intervene proximately caused the harassment from April to June 2021. *See Shields*, 714 A.2d at 888 (finding that a landlord had

20

control over a tenant's pets because it could refuse to re-lease the premises to a pet owner); *Matthews*, 719 A.2d at 125–26 (finding that a landlord had control over pets in the apartment complex because of the "no pets" clause in the underlying lease). Had Defendants exercised this control, such as by warning them against the use of dogs to harass other tenants, the Tenants may have been deterred from continuing to harass Wright and her dog. Resolving all inferences in favor of Wright, as is required at this stage, the Court finds that Defendants' failure to intervene in the harassment could be found to have proximately caused the subsequent harassment. *Id.*

The Court finds, however, that Wright has failed to plead sufficient facts to show that any failure to address gun violence at Willow Lake proximately caused the shooting on June 6, 2021, the only shooting that had any arguable impact on Wright. Specifically, Wright has not sufficiently pleaded facts to show that Defendants' failure to satisfy a duty to take reasonable security measures was the proximate cause of the shooting. In *Davis v. Regency Lane, LLC*, 245 A.3d 115 (Md. Ct. Spec. App. 2021), the Court of Special Appeals of Maryland found that the plaintiff, whose minor child was shot and killed by an unknown assailant outside of an apartment building, did not sufficiently plead a claim for negligence against the landlord based on a failure to prevent criminal activity. *Id.* at 118–19, 132. The court stated that because the plaintiff did not establish "the circumstances of the shooting," such as the "identity of the shooter" or whether they were "trespassers, tenants, or someone else authorized to be on the premises," the plaintiff failed to demonstrate that the landlord's conduct, such as failing to maintain adequate security measures, proximately caused the shooting. *See id.* at 133.

Likewise, Wright has not alleged sufficient facts about the gunshot on June 6, 2021, such as the identity of the shooter, whether the shooter was a tenant, an authorized visitor, or a trespasser, or even if the shot was fired from within the Willow Lake premises, to support a

conclusion that any failure to take any particular security measures proximately caused the shooting, including that the failure to issue crime alerts to tenants—the only specific anti-crime measure referenced by Wright—caused the shooting. Although this case remains at the pleading stage, the allegations in the Amended Complaint—of a shooting at 3:00 a.m. with no observations of the shooter of any kind—provide no basis to conclude that such facts could ever be obtained. Moreover, Wright's claim that one of the Tenants engaged in the dog harassment may be the shooter is pure speculation, particularly since she has not alleged that any of the Tenants ever possessed a firearm, much less used one as part of the dog harassment. The Court therefore finds that Wright has not pleaded sufficient facts to support a claim that Defendants' actions or inactions proximately caused the shooting. *Scott*, 359 A.2d at 556. Thus, Wright has not successfully pleaded causation with respect to her negligence claim arising out of the ongoing gun violence. That negligence claim will be dismissed.

### D. Injury

Although Wright has alleged the existence of a duty, breach of the duty, and causation in relation to the dog harassment, she has failed to allege facts demonstrating an injury from any such breach of the duty. In particular, Wright has not alleged any physical harm that she or her dog suffered as a result of the failure to control the harassing conduct of the Tenants and their dogs. To the extent that she alleges any specific harm, it consists of general emotional distress, specifically, annoyance, an inability to trust others, a need to protect herself, and concern for her safety and that of her dog. Generally, a plaintiff may not recover damages in tort for mental distress without a physical impact. *Exxon Mobil Corp.*, 71 A.3d at 59. However, emotional distress may be compensable if it manifests objectively. *Id.* Such objective manifestations include depression, inability to work or perform household chores, loss of appetite, insomnia, nightmares, weight loss,

22

extreme nervousness and irritability, and social withdrawal. *See Vance v. Vance*, 408 A.2d 728, 734 (Md. 1979) (collecting cases). Where Wright has not asserted sufficient facts demonstrating an objective manifestation of her emotional distress, she has not properly alleged a compensable injury based on her emotional distress. *Hunt v. Mercy Med. Ctr.*, 710 A.2d 362, 370 (Md. Ct. Spec. App. 1998) (finding that allegations that the plaintiff was "emotionally upset" and "very skeptical" were alone insufficient to establish a compensable injury on a negligence claim); *cf. Vance*, 408 A.2d at 734 (finding that the plaintiff's allegations that she went into a state of shock, engaged in spontaneous crying, was unable to sleep, was too embarrassed to socialize, experienced symptoms of an ulcer, suffered an emotional collapse and depression, and suffered a significantly deteriorated physical appearance were sufficient to establish an injury on a negligent misrepresentation claim). While Wright alleges economic harm consisting of the value of one day of rent because she felt compelled to vacate her apartment early, this harm did not arise from the dog harassment. Rather, Wright fled her apartment because of the gunshot, which as discussed above, the Court finds to be insufficiently tied to any of the Tenants to support a plausible claim that it was part of the dog harassment. *See supra* part VI.C.

For these reasons, the Court finds that Wright has failed to state a valid negligence claim as to either the gun violence or the dog harassment and thus will grant the Motion as to the negligence claims.

## VII.   Quiet Enjoyment

Defendants also assert that Wright has failed successfully to plead a claim for breach of the covenant of quiet enjoyment as to both the dog harassment and the gun violence. All leases imply a covenant of quiet enjoyment under which the tenant is entitled to the quiet enjoyment of the premises during the lease term. *Bocchini v. Gorn Mgmt. Co.*, 515 A.2d 1179, 1182 (Md. Ct.

Spec. App. 1986). The covenant "insulates the tenant against acts or omissions on the part of the landlord, or anyone claiming under him, which interfere with the tenant's right to use and enjoyment of the premises for the contemplated purposes." *Id.* at 1182 (quoting *QC Corp. v. Md. Port Admin.*, 510 A.2d 1101, 1110 (Md. Ct. Spec. App. 1986)). In the absence of an actual or constructive eviction, a tenant may have a claim for a breach of the covenant of quiet enjoyment ("quiet enjoyment claim") when the landlord's conduct strikes at the essence of its obligations under the lease. *Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 963 A.2d 253, 266 (Md. Ct. Spec. App. 2009).

A quiet enjoyment claim may exist if, during the lease period, the landlord, or someone whose conduct is attributable to the landlord, interferes with a permissible use of the leased property by the tenant. *Bocchini*, 515 A.2d at 1184. An individual's conduct may be attributed to the landlord if the conduct occurred on the landlord's premises and the landlord could legally control that conduct. *Id.* Under Maryland law, a landlord may be liable on a quiet enjoyment claim based on "disturbances by another tenant" if the landlord was "in a position to correct or terminate" the offending conduct but failed to exercise that authority. *See id.* at 1185 (holding that a quiet enjoyment claim was sufficiently pleaded based on the allegations that another tenant caused a nuisance based on excessive noise and the landlord failed to enforce a lease restriction against "excessive noise or other offensive conduct").

Here, Wright has pleaded sufficient facts to support a quiet enjoyment claim based on the dog harassment. As alleged in the Amended Complaint, the ongoing harassment of Wright and her dog by the Tenants and their dogs interfered with Wright's use of the premises in that she felt compelled to restrict her use of the parking lot and outdoor common areas to avoid the Tenants and their dogs. More specifically, Wright alleges that between April 2021 and June 2021, because

24

of the fear of harassment by the Tenants and their dogs, she was unable to walk her dog around the perimeter of the building and was instead forced to place her dog at a specific location at the center of her patio in order to relieve himself. She also alleges that certain Tenants came up to her glass windows and looked inside repeatedly, which interfered with her ability to use her own apartment without an invasion of privacy. Where Wright reported the harassment to Defendants and the Superintendent in April 2021 and reported another incident on June 5, 2021, it is reasonable to infer that Defendants had the ability to exercise some control over Tenants and their dogs in their capacity as their landlord, whether because of specific lease terms prohibiting offensive conduct or the more general control of having the ability to renew or decline to renew their leases. Viewing the allegations in the light most favorable to Wright, as is required at this stage, the Court finds that Wright has sufficiently pleaded a claim for breach of the covenant of quiet enjoyment arising from the dog harassment.

However, the Court will not find a plausible quiet enjoyment claim based on the gun violence. Wright has not sufficiently alleged that the various shootings by unidentified individuals on the premises before June 6, 2021 were within Defendants' control and does not allege sufficient facts to show that they adversely impacted her ability to use the premises in a manner consistent with the lease. *See Bocchini*, 515 A.2d at 1184. Although Wright alleges that the shot fired on June 6, 2021 caused her to vacate the premises entirely, she has not alleged sufficient facts to support the conclusion that Defendants had control over the individual firing that shot, that the shooter was one of the Tenants, or that the individual's identity could ever be ascertained. *See supra* part VI.C. The Court will therefore dismiss the quiet enjoyment claim as to the gun violence. *See Bocchini*, 515 A.2d at 1184.

## VIII.  Constructive Eviction

Wright further alleges that both the dog harassment and the gun violence resulted in a constructive eviction because following the shot fired on the morning of June 6, 2021, Wright no longer felt safe at Willow Lake and fled the premises three days before the expiration of her lease and did not return.  Defendants assert that Wright has failed to plead sufficient facts to state a plausible claim of constructive eviction.

A constructive eviction occurs when the acts of a landlord cause a serious or substantial interference with the tenant's enjoyment of the property which results in the tenant vacating the premises.  *See McNally v. Moser*, 122 A.2d 555, 562 (Md. 1956); *Stevan v. Brown*, 458 A.2d 466, 470 (Md. Ct. Spec. App. 1983).  The landlord's actions must have been done "with the intent and effect of depriving the tenant of the latter's use and enjoyment" of the rental property.  *McNally*, 122 A.3d at 562.  Moreover, a constructive eviction claim may exist if, during the period the tenant is entitled to possession of the leased property, "someone whose conduct is attributable to [the landlord], interferes with a permissible use of the leased property by the tenant."  *Bocchini*, 515 A.2d at 1184.  If the perpetrator of such conduct is someone whose "conduct could be legally controlled" by the landlord, that individual's conduct may form the basis of a constructive eviction claim.  *Id.*

As to the gun violence, although Wright alleges that the shot fired on June 6, 2021 caused her to abandon her apartment and not return, she has not provided sufficient allegations to support the inference that the gunshot is attributable to Defendants.  As discussed above in relation to the negligence and quiet enjoyment claims, she has not asserted facts that provide a basis to conclude that the identity of the shooter will ever be known.  *See supra* parts VI.C, VII.  Thus, Wright has not demonstrated that "someone whose conduct is attributable to" the landlord interfered with her

26

permissible use of the property, and the Court will grant the Motion as to the claim for constructive

eviction based on the gunshot. *Bocchini*, 515 A.2d at 1184.

As for the dog harassment, Wright asserts that she vacated the premises because of the

gunshot on June 6, 2021, not because of any of the instances of dog harassment described in the

Amended Complaint. While she alleges that the gunshot may have been perpetrated by one of the

Tenants as a continuation of the dog harassment, as discussed above, this conclusory claim is

completely unsupported by any facts. *See supra* parts VI.C, VII. Thus, the dog harassment, even

if arguably attributable to Defendants, did not "result" in Wright "vacating the premises." *Stevan*,

458 A.2d at 470. The Court will therefore grant the Motion as to the claim for constructive eviction

based on the dog harassment.

## IX.   Tortious Interference with Prospective Advantage

Finally, Defendants allege that Wright has not pleaded sufficient facts to support her claim

of tortious interference with a prospective advantage arising from Defendants' report to the

collection agency and the credit reporting agencies of charges that she deemed to be unjustified.

A claim of tortious interference with a prospective advantage ("tortious interference claim") has

four elements that must be established: (1) intentional and willful acts; (2) calculated to cause

damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such

damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual

damage and resulting loss. *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003). The Court

of Appeals of Maryland has stated that:

> [T]he two general types of tort actions for interference with business relationships
> are inducing the breach of an existing contract and, more broadly, maliciously or
> wrongfully interfering with economic relationships in the absence of a breach of
> contract. The principle underlying both forms of the tort is the same: under certain
> circumstances, a party is liable if he interferes with and damages another in his
> business or occupation.

*Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663, 674 (Md. 1984). Where no contract is involved, a "broader right to interfere with economic relations exists." *Id.* Because this tort requires more than mere competition, a claim for tortious interference must include "conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994); *see Kwang Dong Pharm. Co. v. Han*, 205 F. Supp. 2d 489, 497 (D. Md. 2002) (stating that under Maryland law, tortious interference with a prospective advantage is the same tort as tortious interference with business relationships). Such wrongful or unlawful acts include "common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Alexander & Alexander Inc.*, 650 A.2d at 271 (quoting *K & K Mgmt. v. Lee*, 557 A.2d 965, 979 (Md. 1989)). "In addition, 'actual malice,' in the sense of ill will, hatred or spite, may be sufficient to make an act of interference wrongful where the defendant's malice is the primary factor that motivates the interference," and where the malice was not "incidental" to the "pursuit of legitimate commercial goals." *Id.*

Here, Defendants' conduct was certainly intentional in that they deliberately sent a derogatory report to NCAC, which then sent a derogatory report to the credit reporting agencies about Wright's failure to pay outstanding charges. Wright has plausibly alleged that this action, which occurred in September 2021, caused her actual loss in that the negative entry on her credit report prevented her from obtaining employment. For example, in September 2021, immediately following the filing of the derogatory report, Wright had a conditional offer of employment as a federal contractor and was scheduled to start work, but the position "never transpired." Am. Compl. ¶ 133. In February 2022, Wright received an offer for a federal contracting position,

conditional on a credit check, but after the credit check, Wright was "passed up" for the position. Am. Compl. ¶¶ 140–43. Wright further alleges that between September 2021 and March 2022, she received multiple conditional offers of employment for federal contracting positions that were ultimately rescinded after a credit check, and that the only negative information on her credit report resulted from Defendants' derogatory report. Wright currently remains unemployed.

The issue is whether Wright has plausibly alleged that Defendants' actions were willful, "calculated to cause damage to the plaintiff[] in [her] lawful business," and "done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants," such as through actual malice. *Kaser*, 831 A.2d at 53. Though Defendants argue that they genuinely believed that the charges were justified, and a referral of such charges to a collection agency is not necessarily malicious, Wright has alleged certain facts that could support a conclusion that Defendants acted with the requisite purpose. Beyond her claims that the charges for damage to the apartment were unjustified, Wright asserts that, despite the fact that she requested a final invoice on numerous occasions, Defendants refused to provide her with an invoice reflecting her final balance and that they instead blocked her access to the online resident portal, disabling her from reviewing her final balance online. Without a final invoice or access to the online resident portal, Wright had no way of knowing the amount of money she owed to Defendants and could not be expected to pay it. Even without ever giving her a final invoice, they then sent her account to a collection agency, and when she finally received the invoice and both called and sent an email to discuss her disagreement with certain charges, they or their representatives refused to respond. Wright further alleges that Defendants reported her son, Dixon, to NCAC despite the fact that Dixon was not a party to the operative lease agreement. Finally, these actions occurred in the context of Wright's claim that Defendants were aware that she was

being repeatedly harassed by the Tenants and their dogs, but that they took no action to protect her.

At this early stage, where the Court must draw all inferences in favor of Wright, the Court finds that these allegations sufficiently support her claim that Defendants' referral was based on malice. Thus, Wright has pleaded a viable claim for tortious interference. *See Kwang Dong Pharm. Co.*, 205 F. Supp. 2d at 496 (denying a motion to dismiss a tortious interference claim where the plaintiff alleged that the defendant made false statements to his employer that resulted in the termination of plaintiff's employment); *Williams v. Wicomico Cnty. Bd. of Educ.*, 836 F. Supp. 2d 387, 390–91, 398 (D. Md. 2011) (denying a motion to dismiss a tortious interference claim based on allegations that a plaintiff's former employer conveyed false and defamatory statements and information that should have been expunged to plaintiff's prospective employers); *Doe v. Johns Hopkins Health Sys. Corp.*, 274 F. Supp. 3d 355, 361–62, 370–71 (D. Md. 2017) (denying a motion to dismiss a tortious interference claim where the plaintiff alleged that her former employer made knowingly false statements to professional organizations in her field to interfere with her "professional livelihood"). The Motion will be denied as to this claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to: (1) all claims for fraud; (2) all claims under the MCPA; (3) the claim for retaliation under the Prince George's County Code; (5) all claims for negligence; (6) all claims for constructive eviction; and (7) the claim for breach of the covenant of quiet enjoyment based on the gun violence. The Motion will be denied as to: (1) the claim that the retention of Wright's security deposit violated section 13–159(h)(2)(A) of the Prince

George's County Code; (2) the claim for breach of the covenant of quiet enjoyment based on the

dog harassment; and (3) the tortious interference claim.  A separate Order shall issue.

Date:  January 3, 2023

THEODORE D. CHUANG
United States District Judge

31