IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TAMARA L. WRIGHT,

    Plaintiff,

v.      Civil No. 22-484-BAH

WILLOW LAKE APARTMENTS (MD)
OWNER, LLC, *also known as* MORGAN
PROPERTIES & MORGAN
PROPERTIES MANAGEMENT CO. LLC,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF DECISION

This suit concerns claims self-represented Plaintiff Tamara L. Wright[1] ("Plaintiff" or "Wright") brought against her prior landlord management company, Willow Lake Apartments (MD) Owner, LLC, also known as Morgan Properties and Morgan Properties Management Company LLC (collectively "Defendants," "Morgan Properties," or "Willow Lake"). ECF 37 (amended complaint). After Judge Chuang, to whom this case was previously assigned, granted in part and denied in part Defendants' motion to dismiss on January 3, 2023, *see* ECF 54 (memorandum opinion), ECF 55 (order), three claims remained:

> (1) the claim that the retention of Wright's security deposit violated section 13-159(h)(2)(A) of the Prince George's County Code; (2) the claim for breach of the covenant of quiet enjoyment based on the dog harassment, as described in the Memorandum Opinion; and (3) the claim for tortious interference with a prospective advantage.

---

[1] While Plaintiff is *pro se*, she has graduated from an accredited American law school.

ECF 55, at 1. On April 7, 2025, the Court held a one-day bench trial on these three remaining claims.[2] Defendants filed a trial brief in advance of trial. *See* ECF 118. Plaintiff did not. No party has filed proposed findings of fact.[3]

This memorandum sets forth the Court's findings of fact and conclusions of law based upon the evidence and testimony presented at trial. Nearly all of the below findings of fact came from Plaintiff's testimony and the exhibits admitted through her testimony. Plaintiff did not call any other witnesses at trial. Defendants did not call any witnesses and only introduced one document for impeachment purposes (an email chain between Plaintiff and a property manager at Willow Lake).

## I.  FINDINGS OF FACT

While Plaintiff's lease is not in the record before this Court, Plaintiff testified that she lived in an apartment at Willow Lake Apartments, an apartment complex owned and managed by

---

[2] It bears noting that the Court reiterated multiple times that the trial would begin at 9:30 a.m. on April 7. *See* ECF 96, at 1 (January 30, 2025 trial scheduling order); ECF 109, at 8 (March 12, 2025 letter order advising that "the Court intends to keep the March 25, 2025 pretrial conference and April 7, 2025 trial on the calendar"); ECF 114, at 1 (March 25, 2025 letter order permitting Plaintiff to file an amended pretrial order and reiterating that "[t]he bench trial will proceed . . . on April 7, 2025, at 9:30 a.m."); ECF 117, at 2 (April 4, 2025 letter order reiterating the same). Despite all of these reminders, Plaintiff did not appear at the courthouse until nearly two hours later. The Court nevertheless permitted Plaintiff to present her case. The Court took the bench at 11:40 a.m. and the bench trial began in earnest at 12:02 p.m.

[3] The Court did not enter a pretrial order prior to trial because Plaintiff's proposed pretrial orders did not contain the information required by this Court's Local Rules, most notably, a list of specific exhibits Plaintiff planned to introduce at trial. *See* ECF 112 (Plaintiff's original proposed pretrial order); ECF 114 (March 25 letter order directing Plaintiff to file an amended pretrial order by March 28 "list[ing] the specific documents she expects to introduce at trial[] and identify[ing] the witnesses she intends to call"); ECF 115 (Plaintiff's amended pretrial order); ECF 117 (April 4 letter order directing Plaintiff to supplement her proposed pretrial order and list her proposed exhibits with specificity by that afternoon). Despite these orders, the Court did not receive a specific list of the exhibits Plaintiff intended to introduce at trial until Saturday, April 5, when the undersigned emailed Plaintiff directly and she forwarded the exhibit list she had sent to the courtroom deputy.

2

Morgan Properties, in Laurel, Maryland, from April 2016 through June 2021. Plaintiff paid a $500 security deposit before she moved in. Willow Lake Apartments abuts a pond. Plaintiff's apartment faced the pond. Her back sliding glass door opened on to a small concrete patio where Plaintiff kept potted plants. Just beyond Plaintiff's patio was a stretch of grass, which is common property and not part of Plaintiff's apartment or curtilage, and just further is the pond. Plaintiff's lease was scheduled to end on June 9, 2021.

### A. Alleged Harassment by Other Tenants

Plaintiff asserts that a group of six unnamed Hispanic men, teenagers and one boy, allegedly "harassed" and "stalked" her relentlessly while she lived at Willow Lake. Plaintiff asserts that she believes these six individuals are related, some "socially related" and others "biologically related," because she has "seen them picnic together on the other side of the lake" and they would "interrelate" and "sit and talk" together. She believed two were brothers, one about 16–18 years old and the other about 14 years old, because they lived together and looked "virtually identical."

Plaintiff submitted twenty-one videos, each about one minute long and taken from a Ring camera inside or adjacent to her apartment which purportedly show the alleged harassment. *See* Pl. Exs. 1A–1F, 2, 3A–3B, and 4A–4L. Based on the timestamps on these videos, the alleged incidents reflected in each video took place between April 1, 2021, and May 1, 2021. Nearly all of these videos were taken from a camera position inside of Plaintiff's apartment facing a sliding glass door which opened onto Plaintiff's patio.

In only two of these videos does anyone step onto Plaintiff's patio. In one, taken on April 3, 2021, Plaintiff had an encounter with one of the people in the group identified above, which Plaintiff characterizes as a "dog attack" and an "assault and battery." *See* Pl. Ex. 1A. This video

3

depicts Plaintiff outside with her two dogs, a chihuahua and a Husky ("Bo"). Bo is attached to a line and is standing in the grass. Bo starts to lunge and bark in an excited manner. Then, a black dog begins to trot into the frame from the left. With the black dog approaching, Bo and the chihuahua barking, Plaintiff grabs Bo's line and pulls him inside with some difficulty. When she opens the sliding glass door and puts Bo inside, the black dog reaches her patio. The dog does not appear to bark and does not lunge. Bo, now inside, continues barking. A person trails the black dog, grabs the leash (which is attached to the dog), pulls the dog away and walks back from whence they came. He does not say anything during this encounter. In the next video which immediately follows these events, Plaintiff, Bo, and the chihuahua are now inside. The person and the black dog walk out of frame, but then the black dog comes cantering back into frame. With Bo and the chihuahua barking and crying incessantly from inside, the black dog pauses several times, sniffs around the grass, and lifts its leg to urinate. The person does not approach Plaintiff's patio at all during this time, and the dog remains on the grass the entire time.

In the only other video where someone approaches Plaintiff's patio, a young man or adolescent, approaches Plaintiff's sliding glass doors and knocks lightly. He then looks at his phone. After a couple seconds of no response, he peers through the glass door into Plaintiff's apartment. He knocks again, looks around, and then peers into Plaintiff's apartment again. He turns to leave, turns back to the door, checks his phone one more time, looks into the apartment one final quick time, then turns and walks away. Pl. Ex. 3A. The time between this individual first stepping foot on Plaintiff's patio before knocking and leaving is 39 seconds. Pl. Ex. 3A. Plaintiff testified that she did not think he was part of the group she had trouble with.

The rest of the videos depict unidentified people, some of whom appear to be children, walking along the pond, sometimes with a dog, and sometimes looking in the direction of

4

Plaintiff's apartment. Plaintiff testified that one of the adolescents would come around with a string attached to the end of a stick like a whip or a "cat of nine tails," as Plaintiff called it. She testified that this individual can be seen carrying that whip in Plaintiff's Exhibit 2. In that video, which is, like the others, taken from a camera inside Plaintiff's apartment looking outside, an adolescent boy walks from the left around the pond towards Plaintiff's patio. He is holding something, though it is difficult to discern what, at worse it appears to be a stick with a light string hanging from it. When the boy sees Plaintiff recording him with her cell phone, he abruptly turns around and walks back the other way. While the precise distance is difficult to discern, he is at least about ten feet away from Plaintiff's patio when he turns around.

Aside from the videos, Plaintiff also describes another incident on or about June 5, 2021, when Plaintiff asserts that the father of the two adolescent brothers was sitting on his own patio about 100 yards away from where Plaintiff was packing up her apartment and loading her car. She alleges that he was "laughing and pointing" at her and picked up his small white dog (the same dog who can be seen in some of Plaintiff's video exhibits) and made gestures using the dog's paws. Plaintiff described these gestures as "taunting gestures" and alleged that the man "caus[ed] the dog to gesture 'up yours,'" which Plaintiff perceived to be "taunting and disrespectful." He did not say anything to Plaintiff (Plaintiff does not believe this man speaks English). At no other time did this man use his dog to make gestures at Plaintiff. At the time of this event, she had already decided to leave Willow Lake when her lease ended. She never reported this incident to anyone at Morgan Properties.

### B.   Plaintiff Decides Not to Renew Her Lease at Willow Lake.

On April 8, 2021, Plaintiff informed the Willow Lake leasing office that she would not be renewing her lease and would be moving out upon its expiration on June 9, 2021.[4] After she informed the leasing office that she would not be renewing her lease, Plaintiff testified that her next door neighbor, who Plaintiff believed to be a superintendent, caretaker, or maintenance worker for Morgan Properties, approached her and started talking to her about her leaving. Plaintiff contends that he knew she was leaving at the end of her lease, even though she had not told anyone besides the management office. She also testified that he attributed her leaving to her interactions with the other tenants.

Plaintiff's phone log indicates that she called the leasing office on June 5 at 3:16 p.m. and on June 6 at 12:46 p.m. Pl. Ex. 37. Plaintiff testified that on the June 6 call, she reported to someone in the Willow Lake leasing office "You gotta get these guys off me. This is out of control." It is not clear what specific behavior Plaintiff complained of on the call or the precise remedy Plaintiff sought.

### C.   Plaintiff Leaves Willow Lake Abruptly Two Days Early.

Plaintiff was packing up her apartment late into the night when she heard a gunshot in the early morning of June 7 around 3:00 a.m. The gunshot frightened Plaintiff, so she left in her car at that moment without having finished packing and without having cleaned the apartment. While Plaintiff suspects that the gunshot may have been related to some Willow Lake tenants, she admitted that she did not know that for sure. She did not return to finish packing before the lease ended or have anyone else finish packing and cleaning on her behalf.

---

[4] That same day, Plaintiff testified that she had called the police, though Plaintiff did not seek to admit that police report, and the substance of this report is not otherwise clear.

On June 29, 2021, Plaintiff requested via email a "consideration of constructive eviction" and a rent credit for the two days left on her lease. *See* Pl. Ex. 48, at TLW-000168 (June 29, 2021 email from Plaintiff to Willow Lake leasing office, which appears partially redacted, with some words cut off). In the same email, Plaintiff detailed her complaints with the group of other tenants interacting with her dog. *See id.* at TLW-000168–171. While an assistant property manager initially told Plaintiff that Morgan Properties could not honor a rent credit request, she ultimately did receive a rent credit for the requested two days. *See* Pl. Ex. 38 (move in out statement reflecting two-day rent credit); Pl. Ex. 48, at TLW-000166–67 (June 7 and 8, 2021 emails between Plaintiff and Demesha Dyer, an assistant property manager at Willow Lake).

**D.     The Moveout Statement, Referral to Collections, and Plaintiff's Credit Score**

First, as is relevant for Plaintiff's Section 13-159(h) claim, the Court takes judicial notice that Saturday, July 24, 2021, was forty-five days after June 9, 2021, the date on which Plaintiff's lease ended. *See* Fed. R. Evid. 201(b)(2) (noting that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

Plaintiff gave Morgan Properties her forwarding address in Michigan (205 South Ridge Street). *See* Pl. Ex. 48, at TLW-000167 (June 7, 2021 email from Plaintiff to assistant property manager Demesha Dyer). That address is listed on a moveout statement from Willow Lake dated July 13, 2021. *See* Pl. Ex. 39A.[5] The moveout statement letter includes an itemized list of charges

---

[5] Exhibit 39 includes requests for admission Defendants propounded on Plaintiff and two exhibits—A and B. Exhibit A is the moveout statement dated July 13, 2021, which the Court will refer to as Exhibit 39A. Exhibit B is a document titled "Move In Out #13362," which includes moveout inspection pictures and corresponding charges. This is the same exhibit as Plaintiff's Exhibit 62, which is in color, and which Defendants' courteously supplied to aid Plaintiff's presentation at trial. The Court will refer to this Exhibit as Exhibit 39A (black and white version) or Exhibit 62 (color version).

totaling $1,099.15.[6] *See* Pl. Ex. 39A. The letter includes a due date of July 29, 2021, and the following warning: "Please be advised, if your balance is not paid in full by the above due date, Morgan Properties will forward your account balance to an outside collection agency who will be reporting to the three National Credit [Bureaus]." *Id.* Plaintiff asserts that her security deposit was withheld and claims she never received the moveout statement dated July 13. After Plaintiff moved out of her apartment at Willow Lake, she testified that she traveled around the country, first south and then west, performing self-funded "wolf research." She testified that she returned to Michigan on August 2, 2021. During that time, she claimed that her mail was being collected by family. While Plaintiff claims that she never got the July 13 moveout statement, she did not testify as to whether she got any other mail from this time period.

Plaintiff maintains that the first time she saw an itemized list of damage to the apartment was on August 9, 2021, when she received an email from Melissa Holbrook,[7] identified as a collections specialist at First Advantage, affiliated with the National Credit Audit Corporation (NCAC),[8] attaching the moveout statement, albeit in a different format but still reflecting a balance due of $1,099.15, and moveout inspection pictures. *See* Pl. Ex. 38 (moveout statement); Pl. Ex.

---

[6] Plaintiff does not actually dispute that the costs incurred by Defendants resulting from damage to her apartment exceeded her $500 security deposit. While she disputed some of the charges on the moveout statement, like the carpet and the cabinets, she also conceded that she thought Defendants may have been entitled to *more* money than they assessed for other charges, like the refrigerator and dishwasher. Ultimately, she disputed $248.48 of the $1099.15 balance.

[7] The email sender name identifies the sender as Melissa Holbrook, while the signature identifies her as Melissa Nelson. The Court will refer to this person as Melissa Holbrook.

[8] While the nature of the relationship between NCAC and First Advantage is not entirely clear from the record, no party disputes their affiliation or that they appear to be essentially the same for the purposes of this litigation. For example, Melissa Holbrook's email, which identifies her as an employee of First Advantage, also indicates that "NCAC is a debt collector. This is an attempt to collect a debt, any information obtained will be used for that purpose." Pl. Ex. 22.

45 (August 9, 2021 email from Melissa Holbrook); Pl. Ex. 62 (color version of Move In Out #13362 with inspection photographs of Plaintiff's apartment). Plaintiff received a letter dated August 2, 2021, sent to her Michigan address from NCAC/First Advantage notifying her that the $1,099.15 outstanding balance had been placed with NCAC for collection.[9] *See* Pl. Ex. 46.

On August 23, 2021, Plaintiff emailed the Willow Lake leasing office "requesting information regarding any and all corrective actions or investigation" regarding the June 29 email she had sent. *See* Pl. Ex. 48, at TLW-000181. It is not clear whether she ever received a response.

Plaintiff's credit reports indicate that a balance of $1,099 was placed for collection on July 29, 2021, with Willow Lake identified as the original creditor. *See* Pl. Ex. 29. On September 15, 2021, Melissa Holbrook (of NCAC/First Advantage) emailed Plaintiff:

> This is to advise you that your account is scheduled to be reported to the 3 National Credit Bureaus however; [sic] you still have time to satisfy your debt with Willow Lake Apartments - $1099.15 before the debt may adversely affect your credit report and your future housing needs.

Pl. Ex 22. Plaintiff's credit score was negatively affected by the reporting of the debt. *See* Pl. Ex. 27 (Experian and Equifax credit reports dated September 29, 2021, November 11, 2021, February 21, 2022, April 19, 2022, and August 6, 2023).[10] Plaintiff testified that as she was applying for jobs, including with federal contractors, the Federal Aviation Administration, and private entities, Plaintiff contends that "they were ready to hire [her] until they got [her] credit report." In response to the Court's question of what evidence supports the statement that she did not get these jobs

---

[9] Melissa Holbrook also notified Plaintiff that Plaintiff's son, who was at one point on the lease, was also responsible for the debt. *See* Pl. Ex. 49. Plaintiff's son is not a party to this litigation.

[10] The credit reports in evidence do not indicate what Plaintiff's credit score was before September 2021, though they reflect that her score has increased since the fall of 2021. *See* Pl. Ex. 27 (earliest credit score report date of September 29, 2021). Nevertheless, the Court will credit Plaintiff's testimony that the debt being sent to collections decreased her credit score.

9

because of the results of the credit report, Plaintiff stated that she was told so by someone who worked for JURISolutions. *See* Pl. Ex. 26 (background check results). There is no evidence before the Court besides this testimony from Plaintiff to support the statement that she was not hired because of the results on her credit report.

## II.   CONCLUSIONS OF LAW

### A.    Plaintiff's Security Deposit and Prince George's County Code § 13-159(h)

Under the Prince George's County Code, in order to withhold all or a portion of the security deposit for "damage to the leased dwelling unit by the tenant, his family, agents, employees, or social guests in excess of ordinary wear and tear," "[a] detailed statement of any damages or violations of the lease together with the cost actually incurred shall be mailed by first class mail directed to the last known address of the tenant within forty-five (45) days after the lease is terminated." Prince George's County Code § 13-159(h)(2)(A). "The failure of the landlord to inspect the leased dwelling unit or to mail a notice in accordance with paragraph (A) . . . shall cause the landlord to forfeit any right to withhold any part of the security deposit for damages." *Id.* (h)(2)(B).

As noted, forty-five days after June 9, 2021, when Plaintiff's lease expired, is July 24, 2021. Plaintiff testified that she never received the itemized list of damages until she received a copy from the collections agency on August 9, 2021. While Plaintiff repeated numerous times at trial that she did not receive the moveout statement dated July 13, the code provision does not require a former tenant to *receive* the itemized list, only that the landlord *mail* it. That moveout statement containing an itemized list of damages dated July 13, 2021, well within the forty-five-day period, contains the Michigan address Plaintiff acknowledges she gave Willow Lake management as her forwarding address. Plaintiff acknowledges that after she left Willow Lake, she traveled around the country before heading to Michigan. On July 13, she was not in Michigan,

and she did not return to the Michigan address until around August 2. While Plaintiff asserts that her mail was being collected for her by family members, none of these family members testified, and Plaintiff did not explain whether she received all of her other mail from around that period. While Defendants did not present testimony or evidence regarding the mailing of the statement, the Court nevertheless cannot find that Plaintiff has met her burden of establishing by a preponderance of the evidence that Defendants did not mail the itemized statement of damages within the forty-five days required by the code. Judgment will therefore be entered in favor of Defendants on this count.

### B.     Breach of the Covenant of Quiet Enjoyment

In Maryland, a plaintiff seeking to recover against a landlord for breach of the covenant of quiet enjoyment must prove that during the lease period, the landlord, or someone whose conduct is attributable to the landlord interfered with a permissible use of the leased property by the tenant. *See Bocchini v. Gorn Mgmt. Co.*, 515 A.2d 1179, 1182 (Md. App. 1986) (citing *Baugher v. Wilkins*, 16 Md. 35 (1860); *Q C Corp. v. Md. Port Admin.*, 510 A.2d 1101 (Md. App. 1986), *rev'd in part on other grounds,* 529 A.2d 829 (Md. 1986)). "[T]he conduct of another tenant can constitute a breach of the covenant where the landlord has legal authority to control that conduct." *Legg v. Castruccio*, 642 A.2d 906, 922–23 (Md. App. 1994) (citing *Bocchini*, 515 A.2d at 1184) (indicating that the *Bocchini* court adopted the rule laid out in the Restatement (Second) of Property § 6.1 (1977)). "The prevailing view is that '[t]he failure on the part of a tenant to request that an interference cease while the interference is continuing waives any right on the part of the tenant to object to that interference.'" *Id.* at 924 (quoting the Restatement (Second) of Property § 6.1 (1977) cmt. g).

Breach of the covenant of quiet enjoyment can be shown by actual eviction, constructive eviction, or conduct that "substantially interfered with the tenant's use of the premises" so as to "strike[] at the essence of [the landlord's] obligations under the lease." *See Optimum Constr., Inc. v. Remax Realty Ctr., Inc.*, No. 0390, 2022 WL 303729, at *11 (Md. App. Feb. 2, 2022) (internal quotations and citations omitted). Plaintiff was not actually evicted, and her claim for constructive eviction was dismissed, *see* ECF 54, at 26–27, so Plaintiff can only succeed on this claim if the interference with the use of her property was so substantial as to implicate the essence of Morgan Properties' obligations under the lease. *See Optimum Constr.*, 2022 WL 303729, at *11. "[F]or such a breach to be found, there must be evidence that the landlord substantially interfered with the tenant's *use* of the premises, to the tenant's injury." *Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 963 A.2d 253, 267 (Md. App. 2009) (emphasis in original).

Here, Plaintiff argues that she was harassed by other tenants which interfered with her enjoyment of her leased property and that Morgan Properties had an obligation to halt that interference. As a preliminary matter, Plaintiff's lease is not in evidence, so the Court is unable to make any findings as to what Defendants' obligations were under the lease. *See Schuman v. Greenbelt Homes, Inc.*, 69 A.3d 512, 526 (Md. App. 2013) (finding that the landlord's "failure to stop [a neighbor tenant] from smoking would only go to the 'essence of its obligations under the contract' if [the neighbor tenant's] smoking did amount to a nuisance" because the contract prohibited nuisances and finding that such smoking did not amount to a nuisance so there could not be a breach of the covenant of quiet enjoyment).

More substantively, the Court is not convinced that the conduct Plaintiff complains of constitutes substantial interference with the use of her own leased property. Of the twenty-one videos Plaintiff submitted into evidence, only two depict tenants coming onto her property. The

first, in what Plaintiff characterizes as the "dog attack," depicts a person coming onto Plaintiff's patio to retrieve his dog, who had been off leash and had approached Plaintiff's dogs. This dog does not bark or lunge—*Plaintiff's* dog does. In the second video, an adolescent boy approaches her patio to knock on her sliding glass door. While he does peer inside for several seconds, he is on Plaintiff's patio for less than a minute and appeared to be attempting to contact Plaintiff (or, whether or not he knew Plaintiff, the person who lived in that apartment). Other videos, which Plaintiff characterizes as depicting stalking, show people, presumably Willow Lake tenants, walking, sometimes with their dogs, along the common area along a bucolic lake. In none of these videos do any of the subjects say anything to Plaintiff.

The Court finds that the interactions Plaintiff alleges form the basis for her breach of the covenant of quiet enjoyment claim to be no more than ordinary interactions with neighbors in an apartment complex where people live close together. Further, Plaintiff has not established how these interactions with other tenants interfered with the use of her apartment under her lease. Here, just as in *Nationwide Mutual Insurance Co. v. Regency Furniture, Inc.*, there is no evidence that Plaintiff "was deprived, actually or constructively, of the use of [the premises], so that there was a difference in value between the [premises] as actually received under the Lease and as should have been received." 963 A.2d at 267; *cf. Legg*, 642 A.2d at 923 ("In our opinion, a landlord's burdening one tenant with liability for other tenants' utility usage, when the liable tenant has no prior knowledge of that burden and does not consent to it, is a breach of the covenant of quiet enjoyment because it severely interferes with the liable tenant's use of his/her premises.").

Moreover, even if the tenants' behavior substantively interfered with Plaintiff's use of her property, Plaintiff has not established that she informed Defendants of the behavior and asked them to intervene with sufficient time for them to address it. *See Bocchini*, 515 A.2d at 1185

(adopting the view that the analysis centers not on "whether the landlord has *approved* the conduct of the tenant" but rather "whether he is in a position to *correct* or *terminate* it" and that "[w]here, through lease provisions or otherwise, [the landlord] has that ability, . . . he ought not to be able to escape his obligation under a covenant of quiet enjoyment by steadfastly refusing to exercise his authority"); *see also Legg*, 642 A.2d at 924 (remanding to the trial court because "the trial court did not make the necessary findings regarding when and if [the tenant] complained to the [landlords]" about the breach of the covenant of quiet enjoyment—"that the upstairs tenants were not paying their share of the utility bills" and noting that the landlords "were entitled to reasonably sufficient time to take appropriate action").

Plaintiff asserts that her neighbor, who Plaintiff *believes* did maintenance work for Defendants, knew of her plan not to renew her lease after she had informed management (and no one else) of her intention in April of 2021. She also asserts that her neighbor knew of her problems with the other tenants. Setting aside the evidentiary issues with Plaintiff's attributing knowledge to an unnamed person who did not testify before the Court, this is not enough to establish that Plaintiff requested that Defendants intervene, or that this unnamed man who may have performed maintenance work for Defendants had any authority to regulate the behavior of other tenants. Plaintiff testified that she called the management office on June 6—three days before her lease was set to end—to complain about the other tenants. She moved out that night, leaving Defendants with almost no time to attempt a remedy. In an email Plaintiff apparently sent to the Willow Lake leasing office on June 29, 2021, Plaintiff acknowledged that, indeed, she did not complain to management. *See* Pl. Ex. 48. In a section tellingly entitled "WHY I DIDN'T TELL MANAGEMENT," Plaintiff acknowledged that she did not inform management of the alleged issues she was having with her neighbors due to conclusions she drew based on her observations

14

that "each and every one of the maintenance staff since the day [she] moved in has been Hispanic of recent extraction" who did not speak much English and that management had not sent out notices about two shootings occurring at Willow Lake. *See id.* at TLW-000171. According to Plaintiff, the lack of notice regarding the shootings

> tells me that the management considers its profits to be of greater concern than our welfare. Couple that with the fact that each and every member of the maintenance crew is and has always been Hispanic of recent extraction, and it suggests that management may have a vested interest in protecting its employees and that they may retaliate against me if I report any potential wrongdoing on their part.

*Id.* While Plaintiff may have subjectively believed that Defendants would not intervene, or that they would retaliate against her in some way if she told them about her alleged problems, it is well established that a plaintiff tenant must have requested that the interference cease for other tenants' actions to be attributable to the landlord. *Legg*, 642 A.2d at 924 (citing Restatement (Second) of Property § 6.1 (1977) cmt. g). If the actions of other tenants are not attributable to the landlord, then a plaintiff tenant cannot recover for breach of the covenant of quiet enjoyment from the landlord based on those actions. *See id.*

Because Plaintiff has not established by a preponderance of the evidence that other tenants substantially interfered with the use of her property or that Defendants were in a position to stop such interference such that they breached an obligation to Plaintiff, she cannot succeed on her breach of the covenant of quiet enjoyment claim. Judgment will be entered in favor of Defendants on this claim.

### C.    Tortious Interference with Prospective Advantage

To establish a defendant's tortious interference with prospective advantage under Maryland law, a plaintiff must establish that the defendant engaged in:

> (1) intentional and wilful acts; (2) calculated to cause damage to the plaintiff[] in their lawful business; (3) done with the unlawful purpose to cause such damage and

15

loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003) (quotation marks omitted) (quoting *Willner v. Silverman*, 71 A. 962, 964 (Md. 1909)). Where, as here, there is no specific contract involved, the allegedly tortiously interfering acts must be "independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994). Such "[w]rongful or unlawful acts include common law torts and 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" *Id.* (quoting *K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 979 (Md. 1989)). "In addition, 'actual malice,' in the sense of ill will, hatred or spite, may be sufficient to make an act of interference wrongful where the defendant's malice is the primary factor that motivates the interference," and where the malice was not "incidental" to the "pursuit of legitimate commercial goals." *Alexander & Alexander Inc.*, 650 A.2d at 271.

Plaintiff contends that Defendants tortiously interfered with her prospective job opportunities when they referred the $1,099.15 balance to a collections agency. While Plaintiff argues that referring the debt to collections before informing her of it demonstrates the requisite mental state, even assuming the other elements of this tort are met, there is no evidence in the record from which the Court could infer the requisite malice on the part of Defendants. The evidence demonstrates that the debt was referred on July 29, 2021, which appears to be the date the debt was due pursuant to the July 13 moveout statement. Further, while the Court does not doubt that referring the debt to collections negatively affected Plaintiff's credit, there is absolutely nothing in the record from which the Court could infer the causal connection between Plaintiff's

16

unsuccessful job applications and any negative credit report beyond Plaintiff's unsupported conjecture. As such, judgment will be entered in favor of Defendants on this count.

### III.   CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Defendants on all three remaining counts that went to trial. A separate order of judgment will issue.

Dated: May 5, 2025                                                                /s/
                                                                        Brendan A. Hurson
                                                                        United States District Judge